[NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 99-1056

THOMAS PLATT,

Plaintiff, Appellant,

v.

THE STATE OF MAINE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Torruella, Chief Judge,

Cyr, Senior Circuit Judge,

and Hill, Senior Circuit Judge.

John A. Ciraldo, with whom Jennifer L. Sanders and Perkins,
Thompson, Hinckley & Keddy were on brief for appellant.
Charles K. Leadbetter, Assistant Attorney General, with whom Andrew
Ketterer, Attorney General, and Donald W. Macomber, Assistant Attorney
General, were on brief for appellee.

NOVEMBER 4, 1999
CYR, Senior Circuit Judge. Thomas Platt appeals from a
district court order which dismissed his petition for a writ of
habeas corpus. See 28 U.S.C. 2254. We affirm.
I
BACKGROUND
In the early morning hours of July 17, 1994, two persons
wearing camouflage net masks entered the office of the Econo-Lodge
in Bangor, Maine, accosted the desk clerk with a knife, and made
off with $1000 in cash. In due course, Platt and his friends,
Robert King and Dale Braley, were arrested and charged with Class
A robbery under Maine law. After entering into plea agreements
with state and federal prosecutors, King and Braley were sentenced
to lengthy prison terms.
At Platt's state court trial, King invoked the Fifth
Amendment on the ground that he could be placed in jeopardy of
future federal prosecution. The trial judge accordingly declared
King an unavailable witness and the State introduced the transcript
of a January 1995 police interview in which King described how he
and Platt had robbed the Econo-Lodge while Braley waited in the
car. 
In order to safeguard Platt's rights under the
Confrontation Clause, see Bruton v. United States, 391 U.S. 123
(1968) (admission of nontestifying codefendant's statements
incriminating the defendant violates Confrontation Clause), the
King statement was redacted to replace references to "Platt" with
two asterisks (**). When the King statement was read to the jury
the two asterisks were referred to as "some person." Dale Braley
testified that Platt and King had entered the motel while Braley
waited in his car. 
After Platt was convicted and sentenced to twelve years
in prison, the Maine Supreme Judicial Court rejected his Bruton-
based appeal in State v. Platt, 704 A.2d 370 (Me. 1997). Three
days before the SJC decision became final, however, the United
States Supreme Court had issued its decision in Gray v. Maryland,
118 S. Ct. 1151 (1998), which held that the use of incriminating
statements obtained from nontestifying codefendants violates the
defendant's right of confrontation even though the prosecution
redacts their statements by replacing the defendant's name with a
neutral symbol. Id. at 1157.
Thereafter, Platt petitioned for habeas corpus relief in
federal district court, contending that Gray required reversal of
his state-court conviction. Although the district court denied the
petition, it issued a certificate of appealability. 
II
DISCUSSION
A. The Federal Habeas Corpus Standard
The Antiterrorism and Effective Death Penalty Act of 1996
narrowed the conditions in which state-court convictions may be
reviewed in federal habeas corpus proceedings, by providing that
the writ not be granted unless the state court's "adjudication of
the claim . . . resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States." 28 U.S.C. 2254(d)(1) (emphasis added). See O'Brien v.
Dubois, 145 F.3d 16, 24 (1st Cir. 1998).
The parties agree that the admission of King's redacted
statement into evidence violated Platt's rights under the
Confrontation Clause if the Gray decision itself then constituted
a "clearly established" Supreme Court precedent. But the parties
disagree as to whether section 2254 requires that the pertinent
Supreme Court precedent need have been decided by the time the
state court rendered its confrontation-clause ruling, or thereafter
but before the state-court conviction became "final."
Although Platt was tried prior to the Gray decision, the
state-court judgment did not become final until March 12, 1998,
three days after Gray was decided. On an earlier occasion we
deferred a ruling on this issue of first impression. See id. at 20
n.3. We now do so once again, as the admission of the King
statement into evidence amounted at most to harmless error.
B. Harmless Error
Platt argues that admission of the King statement was not
harmless error, since the remaining evidence of his complicity in
the Econo-Lodge robbery was not trustworthy. The burden rests with
the State to establish that the putative Bruton-Gray error had no
"'substantial and injurious effect or influence in determining the
jury's verdict,'" or that it "was [not] of such magnitude that it
actually casts doubt on the integrity of the verdict." Sinnott v.
Duval, 139 F.3d 12, 15 (1st Cir. 1998) (citation omitted). 
Normally, we focus our analysis on three criteria: "(1) the extent
to which the error permeated the proceeding, (2) the centrality of
the issue affected by the error to the case as actually tried and
(3) the relative strength of the properly admitted evidence of
guilt." Levasseur v. Pepe, 70 F.3d 187, 193 (1st Cir. 1995).
1. The Robert King Statement
At a post-arrest interview in January 1995, Robert King
provided the following version of the Econo-Lodge robbery: On the
evening of July 16, 1994, King and his friends, Dale Braley and
Timothy Boudreau, were driving around Bangor in Boudreau's car when
the police stopped the car and ticketed Boudreau for drag racing.
Thereafter, Dale Braley and King left Boudreau and met
"some person" (viz., Platt). Not long after this threesome began
driving around Bangor in Braley's car, Platt suggested they rob the
Econo-Lodge, claiming that he knew the clerk on duty and they could
get "big bucks."
Upon their arrival at the motel, King and Platt donned
camouflage net masks or rubber Halloween masks, retrieved from
Platt's red duffel bag. Platt was carrying a knife. Dale Braley,
the driver, waited in his car. 
When Platt and King confronted the motel clerk, she
became frantic, which upset King, who had understood from Platt's
earlier assertions about "knowing" the clerk that the robbery would
be an "inside deal" and "real easy." After Platt brandished the
knife and forced the clerk to open the cash register, he and King
returned to the Braley car. Later, Platt divided the loot three
ways.
As the State acknowledges, Robert King's statement
readily met the second of the three Levasseur tests the
centrality of the issue implicated by the error since there can
be no real question but that the jury would have understood "some
person" as a reference to "Platt." See Gray, 118 S. Ct. at 1156
(holding that, as a "class," this sort of redacted statement poses
too great a risk that the factfinder may presume that the unnamed
actor was the defendant). Since the Econo-Lodge clerk could
neither identify the two robbers, nor state whether a third
participant had remained in the Braley car, the central dispute at
trial was whether Platt or some other masked person (viz., Dale
Braley) had accompanied Robert King into the motel office. Thus,
the King statement was directly on point.
2. The Pervasiveness of the Error and the
Relative Strength of Other Evidence

The fact that the Robert King statement implicated Platt
is not necessarily dispositive of the harmless-error inquiry. 
Rather, the third criterion "the relative strengths of the cases
for the prosecution and the defense absent the offending evidence"
is "the major test of harmlessness." Sinnott, 139 F.3d at 18. 
As the other evidence of Platt's complicity altogether
aside from the King statement overshadowed and undermined all
defense theories, we conclude that the putative Bruton-Gray error
did not "permeate[] the [state-court] proceeding." Levasseur, 70
F.3d at 193.
a) Kim Stark
Kim Stark, the clerk on duty at the Econo-Lodge on July
17, 1994, provided the following eyewitness version of the robbery:
At 2 a.m., two persons entered the office while she was on the
phone. Each wore a mask made of mesh netting. One wore a hooded
camouflage shirt (State's Exhibit 17), had "dark eyes," wore no
eyeglasses, spoke in a voice Stark did not recognize, wore gloves,
and threatened her with a knife. The second robber, who did not
speak, wore a blue-striped sweatshirt (State's Exhibit 1: blue-
striped sweatshirt with the words "Old Orchard Beach, USA" on
front). The second robber removed approximately $1000 in cash
from the register. Stark was unable to identify either robber. 
She knew Platt as a friend of a friend, and remembered having
spoken with him on June 29, 1994, when he was an overnight guest at
the Econo-Lodge. 
b) Dale Braley
The State's other eyewitness to the robbery was
codefendant Dale Braley, who gave the following account: In July
1994, he shared a Bangor apartment with his fiancee, Wendy, his
brother Donald Braley, Thomas Platt, and Platt's girlfriend, Angela
Turner. On the evening of July 16, 1994, Braley and his friend
Robert King were riding on Main Street in Bangor with Tim Boudreau
at the wheel. After Boudreau was ticketed for drag racing, he
drove to a nearby auto parts store where he parted company with
Braley and King.
Thereafter, Braley and King met Platt, and the three
drove off in Braley's car. Platt suggested that they rob the
Econo-Lodge because he knew the woman who worked there. A maroon
duffel bag (with white handles), which Platt had borrowed from
Angela Turner, was visible in the back seat of the Braley car. The
duffel bag contained "a couple of camouflage suits, couple of hats,
shirts, [and] some tools." Braley testified that these items had
been "used in previous jobs [viz., robberies]."
While Braley waited in his car, Platt and King went into
the motel. King was wearing a "camouflage net suit"; Platt an Old
Orchard Beach sweatshirt. Braley could not recall either Platt or
King donning any other clothing before leaving the car, nor
removing the knife from the glove compartment. Three or four
minutes later, Platt and King ran out of the motel. Braley then
drove them to Tim Boudreau's house, where they left the duffel bag.
The robbery accounts provided by Robert King, Kim Stark
and Dale Braley thus plainly disclosed remarkable similarities.
Although improperly admitted evidence will be considered
harmless if merely cumulative of properly admitted evidence, see,
e.g., United States v. Adams, 74 F.3d 1093, 1099 (11th Cir. 1996),
Platt focuses on what he considers a crucial discrepancy: Robert
King stated that he and Platt had donned the masks which were in
the duffel bag, whereas Dale Braley did not see them do so. Thus,
Platt argues, the King statement was more consistent with the
descriptions of the robbers given by Kim Stark, the Econo-Lodge
clerk; and, without the King statement, the jury would not have
voted to convict based on Braley's inconsistent testimony.
Since Dale Braley's testimony did not necessarily
conflict with that of Kim Stark, however, we conclude that it had
no "substantial and injurious effect" on the verdict.
First, Braley acknowledged that Platt's duffel bag 
containing "[a] couple of camouflage suits" was in the back seat
of the Braley car. Accordingly, no inconsistency existed, since
the term "camouflage suits" amply embraces camouflage masks.
Furthermore, Dale Braley neither testified that King and
Platt had not retrieved the masks from the duffel bag, nor that
they had not worn masks or carried a knife into the motel. Rather,
Braley testified that he could not recall seeing Platt and King
retrieve or put on masks. Nor did King state that he and Platt
either donned the masks while in or near the Braley car, or that
Braley had an opportunity to observe them retrieving or donning
masks. Thus, the Dale Braley testimony did not contradict Kim
Stark's statement that the robbers wore masks while inside the
motel.
Platt next contends that the jury must have rejected the
Braley testimony (i) as unreliable, since he admittedly gave the
police different versions of the crime, and (ii) as self-serving,
since he received a reduced sentence for cooperating with the
State. Neither contention withstands scrutiny.
Braley conceded that he lied to the police at the outset
in order to conceal his own involvement in the robbery, but decided
to confess in November 1994 after hearing rumors that other
witnesses had implicated him. Moreover, in no subsequent interview
did Braley fail to implicate Platt as the third participant in the
motel robbery.
Furthermore, although the defense impeached Braley with
his prior criminal record, and thoroughly explored the terms of the
plea agreement, the jury heard testimony that Braley had important
reasons not to lie about Platt's involvement: Braley, who was
serving a twelve-year prison sentence, with all but six years
suspended, acknowledged that perjury would have exposed him to six
years' further imprisonment. Braley also testified that he and
Platt, a "close friend," shared an apartment in July 1994.
Finally, under the harmless-error analysis the critical
inquiry is not whether the Braley testimony standing alone was
reliable, but whether the jury returned a guilty verdict against
Platt solely because the Robert King statement was in evidence. 
Importantly, the defense impeached the King statement along
substantially the same lines as it had done with Braley,
introducing evidence of King's plea agreement and prior criminal
record (e.g., a 1992 robbery conviction). And the defense adduced
evidence that in January 1996 Robert King had given a different
account of the robbery, claiming that Platt was not involved. 
Thus, had the jury found grounds to consider Braley's testimony
suspect, it would have had like grounds to reject, as unreliable,
the Robert King statement.
c) The Corroborative Evidence 
The State bolstered the Braley testimony with independent
corroborative testimony connecting Platt to the motel robbery. In
order to substantiate the Braley testimony that Platt knew Kim
Stark, the State called both Stark and Dale Braley's brother,
Donald, to confirm that Platt had stayed overnight at the Econo-
Lodge two weeks prior to the robbery. Stark testified that she had
spoken to Platt on that occasion, and that she had met him
previously through a friend. 
Ten days after the Econo-Lodge robbery, an electric
company worker found a red corduroy duffel bag with white handles
(State's Exhibit 2) behind a tree near Church Road in Bangor. 
Inside the bag there was a tag bearing the name and address of
Platt's girlfriend, Angela Turner, as well as a camouflage net
jacket with hood, two camouflage baseball caps fitted with netting
masks, some brown gloves, and a Halloween mask. Turner testified
that she had loaned the bag to Platt for a trip to Chicago on July
9-11, 1994, that she had not seen it after Platt returned from the
trip, and, further, that a friend had supplied Platt with
camouflage clothing. Braley testified that Platt had the duffel
bag in his possession when Braley and Boudreau picked him up at the
airport, and that the same bag was in the back seat of Braley's car
on the morning of the robbery.
Four days after the duffel bag was found near Church
Road, an off-duty detective discovered a plastic shopping bag
inside the foundation of a washed-out bridge at the Ohio Street
extension in Bangor. Among other items, the bag contained the Old
Orchard Beach sweatshirt and a Department of Labor Childcare
Certification card bearing the name "Angela Turner." Stark
testified that one of the robbers had worn the Old Orchard Beach
sweatshirt (State's Exhibit 1); Braley testified that Platt owned
the sweatshirt, and had worn it on the day of the robbery.
Tellingly, Dale Braley's brother, Donald, testified that
Platt had bought the sweatshirt on a recent trip to Old Orchard
Beach. Donald also testified that some time after the robbery he
had driven to Ohio Street with Platt, Platt's friend, Dennis
Sullivan, and Sullivan's girlfriend, Susan Boober where he saw
them hide the plastic shopping bag in the bridge foundation.
Finally, Timothy Boudreau testified that Platt, King, and
Dale Braley had shown up together at Boudreau's apartment on the
morning of the robbery, that all three were acting "hyper," and
that Platt looked "wide-eyed and attentive."
Thus, the corroborating evidence tended strongly to
substantiate the Dale Braley testimony that Platt had been the
third participant in the Econo-Lodge robbery.
d) The Platt Admissions
The State also presented four witnesses Angela Turner,
Donald Braley, Timothy Boudreau and Susan Boober who testified
that Platt had admitted in the presence of each that he had taken
part in the Econo-Lodge robbery. These witnesses testified that
Platt had volunteered different details relating to the robbery: 
Platt told Angela Turner that he had used a four-inch knife in the
robbery; he told Boudreau that he had used a knife and a camouflage
mask, and that he knew the motel clerk. Susan Boober overheard
Platt admit to her boyfriend, Dennis Sullivan, that he had used a
"butter or jack knife" or a "[small] pocket knife."
Platt discounts their testimony as unreliable because
they were not eyewitnesses to the robbery. Cf. Sinnott, 139 F.3d at
18-19 (no harmless error where improperly admitted evidence was
cumulative of testimony of four nonparty eyewitnesses).
Although we found nonparty eyewitness testimony to be
compelling in Sinnott, it does not follow that non-eyewitness
evidence cannot support a finding of harmless error. Each case is
to be judged on its facts. In some circumstances, eyewitness
testimony may be untrustworthy; whereas third-party reports of a
defendant's self-incriminating statements may prove compelling, as
was the case here.
Platt did not simply admit criminal complicity to these
four individuals on the same occasion; he did so in some detail, on
four separate occasions, to nonparty witnesses. Nor does Platt
suggest any reason to suppose that any of these nonparty witnesses
had a motive to testify falsely against him. Rather, Angela
Turner, one of two defense witnesses, had been a reluctant
government witness, see supra note 5, who testified not only that
Platt was the father of her infant daughter, but that she remained
"close" to him and visited him often.
Similarly, Boudreau testified that Platt was his friend
and that in the fall of 1994 he had not told the police that Platt
had admitted his involvement in the Econo-Lodge robbery. Susan
Boober, whose relationship with Platt was more attenuated and whose
testimony was read back to the jury during its deliberations, had
even less apparent motive to testify falsely against him. Thus,
the trial record reveals no plausible basis for supposing that
these four witnesses, independently or in concert, sought falsely
to implicate Platt.
3. Relative Strength of the Defense 
Platt offered two defense theories. First, the defense
suggested that Dale Braley's brother, Donald, who had a prior
robbery conviction, committed the Econo-Lodge robbery along with
Robert King and Dale Braley, and that Dale falsely implicated Platt
to protect Donald. Second, the defense intimated that two persons
Robert King and Dale Braley robbed the Econo-Lodge, not three. 
We conclude that the Robert King statement to the police in January
1995 could not have caused the jury to reject either defense
theory.
The defense suggested that State's Exhibit 1, the Old
Orchard Beach sweatshirt worn by one of the robbers, belonged to
Dale Braley's brother, Donald, rather than Platt. Be that as it
may, the King statement does not so much as mention the Old Orchard
Beach sweatshirt. See supra Section II.B.1. Further, the defense
noted that Kim Stark had not seen either robber wearing eyeglasses,
whereas Platt always wore his glasses. Once again, however, the
King statement never indicated whether or not King's companion had
worn eyeglasses.
Finally, the defense relied on evidence that Donald
Braley had spent one night with Platt at the Econo-Lodge in late
June 1994, thus suggesting that Donald may have been the person who
told Dale Braley and Robert King on July 17 that he knew the motel
clerk. Once again, however, the Robert King statement could not
have hobbled this defense theory, since King did not purport to
comprehend how his companion had become acquainted with Kim Stark. 
Nor did King ever suggest that Donald Braley did not know Stark. 
Finally, Donald Braley acknowledged that he and Platt had stayed at
the Econo-Lodge on a previous occasion.
Far from hindering the defense, the King statement
allowed it to exploit an otherwise unavailable theory that only
two people (viz., Dale Braley and King) committed the Econo-Lodge
robbery, and that no third person remained outside in the getaway
vehicle. Thus, in attempting to impeach the King statement, the
defense was allowed to introduce evidence that King had recently
recanted his January 1995 statement, and now claimed that Platt was
never involved in the robbery.
III
CONCLUSION
For these reasons, we cannot conclude that admission of
the redacted King statement into evidence constituted error of such
magnitude as to have had a substantial effect on the jury verdict. 
See Sinnott, 139 F.3d at 15. Accordingly, the district court order
is affirmed.